**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. <u>1:25-cv-02180</u>

LEE RUNEY, derivatively on behalf of DMC
GLOBAL INC.,

                          Plaintiff,

     v.

MICHAEL KUTA,
ERIC WALTER,
BRETT SEGER,
RUTH DREESSEN,
MICHAEL KELLY,
JAMES O'LEARY,
SIMON BATES,
OUMA SANANIKONE,
and CLIFTON PETER ROSE

                          Defendants,

     and

DMC GLOBAL INC.,

                         Nominal Defendant.

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Lee Runey ("Plaintiff"), by and through the undersigned attorneys, brings this derivative complaint for the benefit of Nominal Defendant DMC Global Inc. ("DMC" or the "Company"), against current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff's allegations are based upon personal knowledge, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by DMC with the United States Securities and Exchange

Commission (the "SEC"); press releases, new reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, including the consolidated securities class action lawsuit *Garson v. DMC Global Inc. et al.*, Case No. 1:24-cv-03387-GPG-CYC (D. Col.) (the "Securities Class Action"); corporate governance documents available on DMC's website; and other publicly available information.

<u>**NATURE AND SUMMARY OF THE ACTION**</u>

1.      This is a shareholder derivative action brought on behalf of DMC against certain current and former executive officers and directors the Company for, among other things, breaching their fiduciary duties to the Company and its stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements concerning the Company's financial condition and business operations between, at least, January 29, 2024 and November 4, 2024, both dates inclusive (the "Relevant Period").

2.      DMC is an industrial company. In December 2021, in an effort to diversify its business and expand its addressable markets, DMC bought 60% of Arcadia Products, LLC. As a result, DMC now conducts business through three main business and reporting segments: (i) Arcadia Products ("Arcadia"); (ii) DynaEnergetics; and (iii) NobelClad.

3.      Throughout the Relevant Period, DMC falsely assured investors that its Arcadia segment was performing well and had a goodwill valuation of $141,725,000 as of March 31, 2024 and June 30, 2024. These assurances were made even though Arcadia's revenues and EBITDA declined sharply. The Company also touted its efforts to improve its operations and systems and evaluate and develop new operating strategies for its three business segments.

4.      The statements identified herein were materially false and misleading when made because they failed to disclose, *inter alia,* that (i) the goodwill associated with Arcadia was overstated; (ii) the goodwill valuation method, and thus factors bearing on the goodwill valuation,

was subject to change without notice to investors; (iii) as a result of delaying impairment of its goodwill associated with Arcadia, DMC's net income, assets, and equity on its balance sheet was overstated by material amounts; (iv) DMC's internal controls were materially inadequate, resulting in inaccurate guidance, financial reporting, and public disclosures; and (v) as a result of the foregoing, Defendants misrepresented DMC's operations and financial results. As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

5.      The truth began to emerge in October 2024 when DMC disclosed, among other things, a $141.7 million goodwill impairment charge associated with DMC's acquisition of a controlling interest in Arcadia and admitted that the Company had changed its goodwill valuation methodology.

6.      On this news, DMC's stock price fell $2.36, or 18.3%, to close at $10.57 per share on October 22, 2024.

7.      On November 4, 2024, DMC released its third quarter 2024 financial results, reporting sales of $152.4 million, a $159.4 million net loss (inclusive of a $141.7 million goodwill impairment charge at Arcadia Products), and adjusted EBITDA of $5.7 million.

8.      On this news, DMC's stock price fell $0.59, or 6%, to close at $9.25 per share on November 5, 2024.

9.      As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and misleading statements and omissions of material fact to the investing public. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct. The misconduct described herein has subjected the Company to the need to undertake internal investigations, the need to implement adequate internal

controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein. As such, the Company will have to expend many millions of dollars.

10.    Further, the Individual Defendants' misconduct has subjected the Company and various of its former and current officers and directors to potential liability in the Securities Class Action.

11.    In light of the Individual Defendants' breaches of fiduciary duties; the Company directors' collective engagement in fraud and misconduct; the substantial likelihood of the directors' liability in this derivative action; the officers' and directors' liability in the Securities Class Action; and of their not being disinterested and/or independent directors, a majority of DMC's Board cannot consider a demand to commence litigation against themselves on behalf of DMC with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.    This action is not a collusive one to confer jurisdiction on a court of the United States which it would otherwise not have.

15.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this court under 28 U.S.C. § 1391, because (i) DMC is headquartered in this District, (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this jurisdiction, and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have had an effect in this District.

**PARTIES**

17.     Plaintiff is a current shareholder of DMC and has continuously held DMC stock at all relevant times.

18.     Nominal Defendant DMC is a Delaware corporation with its principal executive offices located at 11800 Ridge Parkway, Suite 300, Broomfield, Colorado 80021. DMC's common stock trades on the Nasdaq under the ticker symbol "BOOM."

19.     Defendant Michael Kuta ("Kuta") served as DMC's President, Chief Executive Officer ("CEO"), and a member of the Board from August 2023 through his retirement, effective November 29, 2024. Defendant Kuta previously served as DMC's interim co-CEO from January 2032 until August 2023, and as DMC's Chief Financial Officer ("CFO") from 2014 to January 2023. According to the Schedule 14A filed by the Company with the SEC on April 1, 2025 (the "2025 Proxy Statement"), as of March 20, 2025, Defendant Kuta owned 68,320 total shares of DMC

common stock. For the fiscal year ended December 31, 2024 ("2024 Fiscal Year"), Defendant Kuta received $4,138,125 in total compensation from the Company.

20.     Defendant Eric Walter ("Walter") has served as the CFO of the Company since 2023. Defendant Walter previously served as the Company's Senior Vice President of Finance. According to the 2025 Proxy Statement, as of March 20, 2025, Defendant Walter owned 111,630 total shares of DMC common stock. For the 2024 Fiscal Year, Defendant Walter received $1,890,932 in total compensation from the Company.

21.     Defendant Brett Seger ("Seger") has served as the Chief Accounting Officer of the Company since 2023. For the 2024 Fiscal Year, Defendant Seger received approximately $489,000 in total compensation from the Company.

22.     Defendant Ruth Dreessen ("Dreessen") has served as a Company director since 2020. She is Chair of the Audit Committee and a member of the Compensation Committee and the Corporate Governance and Nominating Committee. According to the 2025 Proxy Statement, as of March 20, 2025, Defendant Dreessen owned 30,766 total shares of DMC common stock. For the 2024 Fiscal Year, Defendant Dreessen received $219,998 in total compensation from the Company.

23.     Defendant Michael Kelly ("Kelly") has served as a Company director since 2020. He is Chair of the Compensation Committee and a member of the Corporate Governance and Nominating Committee and the Risk Committee. According to the 2025 Proxy Statement, as of March 20, 2025, Defendant Kelly owned 31,073 total shares of DMC common stock. For the 2024 Fiscal Year, Defendant Kelly received $213,144 in total compensation from the Company.

24.     Defendant James O'Leary ("O'Leary") has served as a Company director since November 2023, as Executive Chairman of the Board since October 2024, and as President and CEO since June 2025. Defendant O'Leary is a member of the Risk Committee. According to the 2025 Proxy Statement, as of March 20, 2025, Defendant O'Leary owned 216,412 total shares of DMC

common stock. For the 2024 Fiscal Year, Defendant O'Leary received $3,547,422 in total compensation from the Company.

25.     Defendant Clifton Peter Rose ("Rose") has served as a Company director since 2016. Defendant Rose is Chair of the Risk Committee and a member of the Audit Committee and the Compensation Committee. On October 16, 2024, Defendant Rose notified the Company of his decision to retire. According to the 2025 Proxy Statement, as of March 20, 2025, Defendant Rose owned 44,408 total shares of DMC common stock. For the 2024 Fiscal Year, Defendant Rose received $209,998 in total compensation from the Company.

26.     Defendant Ouma Sananikone ("Sananikone") has served as a Company director since 2023. She is Chair of the Corporate Governance and Nominating Committee and a member of the Audit Committee. According to the 2025 Proxy Statement, as of March 20, 2025, Defendant Sananikone owned 18,256 total shares of DMC common stock. For the 2024 Fiscal Year, Defendant Sananikone received $206,289 in total compensation from the Company.

27.     Defendant Simon Bates ("Bates") was Company director from June 2024 until April 30, 2025. He was Chair of the Risk Committee and member of the Audit Committee, the Compensation Committee, and the Corporate Governance and Nominating Committee. According to the 2025 Proxy Statement, as of March 20, 2025, Defendant Bates owned 13,772 total shares of DMC common stock. For the 2024 Fiscal Year, Defendant Bates received $99,144 in total compensation from the Company.

28.     Defendants Kuta, Walter, Seger, Dreessen, Kelly, O'Leary, Rose, Sananikone, and Bates are collectively referred to herein as the "Individual Defendants."

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29.     By reason of their positions as officers, directors, and/or fiduciaries of DMC and because of their ability to control the business and corporate affairs of DMC, the Individual

Defendants owed DMC and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage DMC in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of DMC and its shareholders.

30.    Each director and officer of DMC owes to DMC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of DMC and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

31.    The Individual Defendants, as officers and/or directors of a publicly held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, had a duty to promptly disseminate accurate and truthful information regarding DMC's operations, finances, financial condition, financial statements, performance, growth, earnings, internal controls, and present and future business prospects so that the market price of DMC's stock would be based on truthful, accurate, and fairly presented information.

32.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of DMC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by DMC. Because of their advisory, executive, managerial and directorial positions with DMC, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of DMC.

33.    The Individual Defendants, as officers and/or directors of DMC, were required to discharge their duties by exercising reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of DMC. By virtue of such duties, the officers and directors of DMC were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, ethical, and businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide the public, investors, and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of internal legal, financial, and management controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

34.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to DMC and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of

due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

35.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of DMC, the absence of good faith on their part, and a reckless disregard for their duties to DMC and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.     The Individual Defendants breached their duties of loyalty and good faith by causing DMC to issue false and misleading statements concerning its financial condition. As a result, DMC has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

*Company Background*

37.     In 1965, DMC began as an unincorporated business in Colorado named "Explosive Fabricators." In 1971, the business was incorporated as "E.F. Industries, Inc.," which later changed to "Explosive Fabricators, Inc." In 1976, the Company went public. In 1994, the Company changed its name to "Dynamic Materials Corporation."

38.     In 2001, DMC expanded its explosive metalworking operations into Europe when it acquired almost all of the stock of a French company, NobelClad Europe SA ("NobelClad"). In 2007, the Company further expanded its European operations and added a complementary energy products business when it acquired a German company, DynaEnergetics GmbH & Co. KG and certain affiliates ("DynaEnergetics").

39.    In 2013, DMC consolidated its explosive metalworking operations under the NobelClad brand and, in 2014, re-branded its energy products segment as DynaEnergetics.  In 2016, the Company changed its name to DMC Global Inc, its current name.

40.    From 2016 through 2021, DMC was comprised of NobelClad and DynaEnergetics. In 2021, in an effort to diversify DMC's business and expand its addressable markets, DMC bought 60% of Arcadia Products, LLC ("Arcadia").

41.    As a result, DMC is now a publicly-traded, diversified industrial company that conducts business through three main business and reporting segments: (i) Arcadia, which supplies architectural building products; (ii) DynaEnergetics, which designs, manufactures, and sells highly engineered products utilized by the global oil and gas industry; and (iii) NobelClad, which produces explosion-resistant composite metals used in various industries, including oil and gas, marine, and defense.

42.    During the years ended December 31, 2022 and December 31, 2023, Arcadia represented approximately 46% and 42% of DMC's consolidated net sales, DynaEnergetics represented approximately 40% and 44%, and NobelClad represented approximately 14% and 15%, respectively.

43.    In 2023, DMC began a plan to improve its operations and systems and evaluate and develop new operating strategies for its three business segments.

***The Acquisition of Arcadia and Goodwill***

44.    The Company acquired a 60% controlling stake in Arcadia in December 2021, paying $282.5 million and recording a $141.2 million goodwill. Thus, Arcadia's book value (a Company's or asset's worth) at the time of purchase was $141.3 million (i.e. the purchase price minus the goodwill recorded).

45.     When a public company acquires another entity for more than its worth (calculated by subtracting liabilities from assets), a new asset called "goodwill" is created. Goodwill is an intangible asset that constitutes the portion of the purchase price above the net fair value of all the assets purchased. The underlying value of the goodwill asset often consists of, among other things, the acquired company's brand name, customer base, customer relations, employee relations, and/or proprietary technology.

46.     Because goodwill is an intangible asset, or static figure, its value is reported at the acquisition price unless or until the intangible asset must be written off, or "impaired."

47.     Issuers of a static figure are obligated to value it to determine whether the reported value on the balance sheet fits reality. To value goodwill, an "income approach" or a "market approach" can be used. If using an "income approach," drivers of fair value for a reporting unit may be cash flow projections, terminal growth rate, or the weighted-average cost of capital. If using a "market approach," drivers of fair value for a reporting unit may be applicable industry multiples, such as multiples of revenue or earnings before interest, taxes, depreciation, and amortization ("EBITDA").

48.     If, after using either approach, it is determined that goodwill exceeds its carrying value (if its present net value is less than that publicly reported), the issuer must write-off the goodwill down to the market value level and record an impairment charge.

49.     An impairment charge is an acknowledgement that an acquired business is no longer worth as much as it was at the time of acquisition. Goodwill impairments directly reduces net income on the income statement and also reduces assets and shareholders' equity on an issuer's balance sheet.

50.     In other words, when goodwill becomes impaired, the amount of the resulting impairment reduces the goodwill asset on the acquiring Company's balance sheet, which has a direct

and corresponding effect on earnings. If goodwill is overstated (meaning it is not impaired but should be), then the Company's earnings will be overstated.

51.      If goodwill remains fully intact, it represents that the acquired business still commands a valuation that exceeds the acquired Company's book value (otherwise it would be impaired, or written down).

52.      DMC first reported Arcadia's goodwill in its 2021 Form 10-K, filed on March 1, 2022 and signed by Defendants Kuta (when he was the Company's CFO), Kelly, and Rose. Therein, the Company stated:

> Goodwill represents the amount by which the purchase price exceeds the fair value of identifiable tangible and intangible assets and liabilities acquired in a business combination. Goodwill acquired in a business combination and determined to have an indefinite useful life is not amortized, but instead is tested for impairment at least annually during the fourth quarter or whenever events or changes in circumstances indicate that the carrying value might not be fully recoverable. For goodwill, impairment is assessed at the reporting unit level. A reporting unit is defined as an operating segment or a component of an operating segment to the extent discrete financial information is available that is reviewed by segment management.
>
> As of and for the year ended December, 31, 2021, all goodwill recorded within the Consolidated Balance Sheet relates to the Arcadia acquisition. Given the proximity of the acquisition date to the balance sheet date, a quantitative impairment assessment was not deemed necessary of performance. No goodwill was outstanding as of and for the year ended December 31, 2020.

53.      From the acquisition of Arcadia in December 2021 until the end of the Relevant Period, DMC continuously reported $141 million in goodwill for Arcadia on its consolidated balance sheet.

54.      In the Company's Form 10-K filed with the SEC on December 31, 2023, DMC described the conditions that it would test its goodwill to determine if an impairment may be warranted:

> Goodwill acquired in a business combination and determined to have an indefinite useful life is not amortized, but instead is tested for impairment at least annually during the fourth quarter or whenever events or changes in circumstances  indicate

that the carrying value might not be fully recoverable. For goodwill, impairment is assessed at the reporting unit level. A reporting unit is defined as an operating segment or a component of an operating segment to the extent discrete financial information is available that is reviewed by segment management. The Company's reporting units are each of the three operating segments disclosed in Note 10 within Item 8 — Financial Statements and Supplementary Data.

To test goodwill for impairment, we first perform a qualitative assessment to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying value. For the qualitative assessment, we consider macroeconomic and market conditions, cost factors, financial performance and other relevant entity-specific events. If we conclude that it is more likely than not that the fair value of a reporting unit is less than its carrying value during the qualitative assessment, then we quantitatively estimate the fair value of the reporting unit and compare the estimated fair value to its carrying value. Based on the results of the quantitative assessment, if the carrying value exceeds the fair value of the reporting unit, an impairment loss is recognized for the difference.

The assumptions used in a quantitative assessment require significant judgment, which include assumptions about future economic conditions and company-specific conditions and plans. In the Company's quantitative assessment, we estimate the fair value ***of a reporting unit by using the income approach, specifically a discounted cash flow analysis.***[1] A number of assumptions and estimates are required in performing the discounted cash flow analysis, including forecasts of revenues, gross profits, capital expenditures, discount rates, working capital changes, and terminal growth rates. Actual results may differ from those assumed in the forecasts.

As of December 31, 2023, the carrying value of goodwill was $141,725[,000] and relates entirely to the Arcadia Products operating segment and reporting unit. As of the date of the 2023 annual impairment test, we performed a quantitative assessment and concluded that the fair value of the Arcadia Products reporting unit exceeded its carrying value by approximately 10%. Discount rates are one of the more significant assumptions used in the income approach. If the Company increased the discount rate used by approximately 100 basis points, the fair value of Arcadia Products would still exceed its carrying value. A sustained decline in general economic conditions, activity levels in end markets or equity valuations could impact the judgments and assumptions used to estimate the fair value of Arcadia Products, and the Company could be required to record an impairment charge in the future. If the Company was required to recognize an impairment charge in the future, the Consolidated Balance Sheets and Consolidated Statements of Operations and Comprehensive Income (Loss) could be materially impacted; however, the non-cash charge would not impact the Company's consolidated cash flows, current liquidity, and capital resources.

---

[1] All emphasis added unless otherwise noted.

*Materially False and Misleading Statements and Omissions Issued During the Relevant Period*

**January 2024 Press Release**

55.     The Relevant Period begins on January 29, 2024, when before the market opened, DMC issued a press release titled, "DMC Global Announces Strategic Alternatives Process for DynaEnergetics and NobelClad Businesses." The press release described Arcadia as the Company's "core division" and stated, in relevant part:

> DMC [] today announced its board of directors ("the Board") has initiated a review of strategic alternatives for its DynaEnergetics and NobelClad businesses.
>
> The strategic review process formalizes DMC's ongoing efforts over the past several months to consider opportunities for unlocking shareholder value. The Board has retained a financial advisor and may retain other advisors to assist the Board in evaluating DMC's current strategy, operations, and capital structure. ***The Board will consider various strategic, business, and financial alternatives for DMC's DynaEnergetics and NobelClad businesses.*** These could include, among other things, a sale, a merger or other business combination of a portion of DMC's business-unit assets, and/or a strategic investment.
>
> David Aldous, DMC's chairman, said, "One year ago, we began evaluating and developing new operating strategies for our business units. Since Michael Kuta's appointment as CEO less than six months ago, we have been executing those strategies, and now are focused on opportunities to maximize the value of our portfolio with the help of our financial advisor."
>
> Aldous continued, ***"Arcadia Products is a core division of DMC***, and we are taking a very focused approach toward maximizing its differentiated business model and ***capitalizing on growth opportunities*** within its large addressable markets. ***Both DynaEnergetics and NobelClad are valuable, industry-leading businesses with strong margin profiles.*** However, the Board and management team are aligned with the view expressed by many DMC shareholders that the Company should seek to ***simplify its portfolio to drive improved shareholder value***. During the review process, the Board and management team will continue to execute DMC's strategy and will remain very focused on running our businesses."

15

56.     The market reacted favorably to the January 29, 2024 press release, with the price per share gaining over 8% from the prior trading day, on unusually high trading volume. Following the press release, Bloomberg News reported that the announcement "should be viewed favorably by investors."

57.     The above statements in ¶55 were materially false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) Arcadia's business was not, in fact, growing; and (ii) Arcadia's underlying business was not performing better than the other two operating segments. As a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## 2023 Form 10-K

58.     On February 23, 2024, DMC filed its 2023 Annual Report on a Form 10-K with the SEC (the "2023 10-K"), which was signed by Individual Defendants Kuta, Walter, Seger, Dreessen, Kelly, O'Leary, Rose, and Sananikone.

59.     The 2023 10-K described the "qualitative assessment" that DMC employed to test goodwill for impairment, stating, in relevant part:

> ***To test goodwill for impairment***, we first perform a qualitative assessment to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying value. For the qualitative assessment, we consider macroeconomic and market conditions, cost factors, financial performance and other relevant entity-specific events. If we conclude that it is more likely than not that the fair value of a reporting unit is less than its carrying value during the qualitative assessment, then we quantitatively estimate the fair value of the reporting unit and compare the estimated fair value to its carrying value. Based on the results of the quantitative assessment, if the carrying value exceeds the fair value of the reporting unit, an impairment loss is recognized for the difference.
>
> The assumptions used in a quantitative assessment require significant judgment, which include assumptions about future economic conditions and company-specific conditions and plans. ***In the Company's quantitative assessment, we estimate the fair value of a reporting unit by using the income approach, specifically a***

***discounted cash flow analysis.*** A number of assumptions and estimates are required in performing the discounted cash flow analysis, including forecasts of revenues, gross profits, capital expenditures, discount rates, working capital changes, and terminal growth rates. Actual results may differ from those assumed in the forecasts.

As of December 31, 2023, the carrying value of goodwill was $141,725[,000] and relates entirely to the Arcadia Products operating segment and reporting unit. As of the date of the 2023 annual impairment test, we performed a quantitative assessment and concluded that the fair value of the Arcadia Products reporting unit exceeded its carrying value by approximately 10%. Discount rates are one of the more significant assumptions used in the ***income approach.*** If the Company increased the discount rate used by approximately 100 basis points, the fair value of Arcadia Products would still exceed its carrying value. A sustained decline in general economic conditions, activity levels in end markets or equity valuations could impact the judgments and assumptions used to estimate the fair value of Arcadia Products, and the Company could be required to record an impairment charge in the future. If the Company was required to recognize an impairment charge in the future, the Consolidated Balance Sheets and Consolidated Statements of Operations and Comprehensive Income (Loss) could be materially impacted; however, the non-cash charge would not impact the Company's consolidated cash flows, current liquidity, and capital resources.

60.    The above statements recorded or referenced in ¶59 were materially false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the goodwill associated with Arcadia was overstated; (ii) the goodwill valuation method, and thus factors bearing on the goodwill valuation, was subject to change without notice to investors; (iii) as a result of delaying impairment of its goodwill associated with Arcadia, DMC's net income, assets, and equity on its balance sheet was overstated by material amounts; (iv) DMC's internal controls were materially inadequate, resulting in inaccurate guidance, financial reporting, and public disclosures; and (v) as a result of the foregoing, Defendants misrepresented DMC's operations and financial results. As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

**First Quarter 2024**

61.    On May 2, 2024, after the markets closed, DMC issued a press release titled, "DMC Global Reports First Quarter Financial Results," which was also filed on Form 8-K with the SEC and signed by Defendant Walter.

62.    The press release announced the Company's first quarter 2024 results, including: $2.3 million in net income; $4.2 million in adjusted net income; $0.21 adjusted diluted EPS; $16.7 million in adjusted EBITDA (attributable to DMC Global); and $19 million total adjusted EBITDA, inclusive of non-controlling interest ("NCI").

63.    The press release also gave second quarter 2024 guidance, including $161 million to $171 million in sales ($64 to $68 million attributed to Arcadia) with adjusted EBITDA of $14 to $17 million (including $7 to $9 million attributed to Arcadia before NCI allocation).

64.    The press release also stated, in part:

"DMC's first quarter sales declined 9% versus the same quarter last year, reflecting challenging market conditions at two of our three industrial manufacturing businesses," said Michael Kuta, president and CEO. ***"Arcadia Products, our architectural building products business, was impacted by a late-quarter slowdown in short-cycle commercial activity, lower sales at its high-end residential division, and an approximately 10% decline in aluminum pricing versus last year's first quarter.*** DynaEnergetics, our energy products business, reported steady demand and record unit sales of its industry-leading DynaStage perforating system, but was impacted by ongoing pricing pressure in its primary North American onshore market. NobelClad, our composite metals business, delivered strong first quarter results, with sales and adjusted EBITDA above our forecasts."

***Arcadia Products reported first quarter sales of $61.9 million, down 23% from last year's first quarter. Adjusted EBITDA margin was 9.5%, down from 13.0% in the first quarter last year. The drop off in short-cycle commercial sales at certain Arcadia service centers reflects soft construction activity in portions of Arcadia's western and southwestern U.S. service territory, while Arcadia's ultra-high-end residential division experienced a sharp decline in its order backlog in March.***

65.    Also on May 2, 2024, after the markets closed, DMC filed a quarterly report on Form 10-Q with the SEC (the "1Q24 10-Q"), which was signed by Defendants Walter and Seger.

66.     Attached to the 1Q24 10-Q were certifications pursuant to Sections 302 and 906 of Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Kuta and Walter attesting to the accuracy of the statements and financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

67.     With respect to DMC's disclosure controls and procedures, the 1Q24 10-Q stated:

> ***Our management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer have evaluated the Company's disclosure controls and procedures,*** as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report, ***and they have concluded that these controls and procedures are effective.***

68.     The 1Q24 10-Q reiterated the first quarter results from the press release including: $2,319,000 in net income; $4,167,000 in adjusted net income; $0.21 adjusted diluted EPS;$16,683,000 in adjusted EBITDA (less EBITDA attributable to NCI); and $19,045,000 total adjusted EBITDA.

69.     The 1Q24 10-Q reported goodwill of $141,725,000 as of March 31, 2024.

70.     The 1Q24 10-Q incorporated by reference the 2023 10-K, including the Company's goodwill statements and discussions of the "income approach," as set forth above in ¶59.

71.     The 1Q24 further stated that "[o]ur critical accounting estimates have not changed from those reported in Item 7 – Management's Discussion and Analysis of Financial Condition and Results of Operations in the Company's [2023 10-K]."

72.     Later the same day, on May 2, 2024, DMC conducted a conference call with analysts and investors to talk about the Company's first quarter 2024 results.

73.     On the call, Defendant Kuta had the following exchange with an analyst:

> [Analyst]: Do you know how much of that storefront business is new build versus like replacement type business? Or is that just hard to gauge because it's – you have trucks lining up there just

taking sticks every day. You may not [indiscernible] curious if you have – is it a new build or replacement or too hard to tell?

[Kuta]: It's too hard to tell right now. We're actually getting a lot of good visibility now out of our ERP system. We're not there on that yet . . . Hopefully, in the coming months, quarters, we can start talking a little bit more about that. But it's certainly a mix of new build and repair and remodel.

[Analyst]: Got it. And then speaking to the ERP system. I did a quick – aluminum prices actually looked like they kind of spiked a little bit through April past. There's been a little bit of mismatch between sort of inventory coming out, product going out with the ERP system, right? Any concern there? Or we sort of move beyond that or...

[Kuta]: *I don't see any concern there. There's a tick up there in aluminum. Hopefully, we might even be able to capture some margin there. So I don't think anything to be concerned about. Maybe even a little bit upside there as we kind of move through the year.*

74.    The above statements contained or referenced in ¶¶62-73 were materially false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the goodwill associated with Arcadia was overstated; (ii) the goodwill valuation method, and thus factors bearing on the goodwill valuation, was subject to change without notice to investors; (iii) as a result of delaying impairment of its goodwill associated with Arcadia, DMC's net income, assets, and equity on its balance sheet was overstated by material amounts; (iv) DMC's internal controls were materially inadequate, resulting in inaccurate guidance, financial reporting, and public disclosures; and (v) as a result of the foregoing, Defendants misrepresented DMC's operations and financial results. As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

**2024 Proxy Statement**

75.     On May 15, 2024, DMC filed a proxy statement on Schedule 14A with the SEC (the "2024 Proxy Statement"). The 2024 Proxy Statement was solicited by the Board pursuant to Section 14(a) of the Exchange Act and sought shareholder approval for, *inter alia*, the re-election of Individual Defendants Kuta, Dreesen, Kelly, O'Leary, Rose and Sananikone to the Board.

76.     In a section titled "Risk Oversight," the 2024 Proxy Statement stated:

Our senior management manages the risks facing the Company under the oversight and supervision of the Board. The Company has a global Enterprise Risk Management ("ERM") team, which comprises senior management in key business areas. The ERM team employs a proactive approach to reviewing and analyzing current and potential risks facing the Company and reports to the Board regarding the ERM process and risk findings on a quarterly basis. While the full Board is ultimately responsible for risk oversight at our Company, our Board committees assist the Board in fulfilling its oversight function in certain areas of risk. The Audit Committee assists the Board in fulfilling its oversight responsibilities with respect to risk in the areas of financial reporting processes and internal controls around those processes (including cybersecurity related thereto), the Company's compliance with legal and regulatory requirements and the financial risks of the Company. The Corporate Governance and Nominating Committee oversees governance matters, including primary oversight of the Code of Ethics and Business Conduct. The Compensation Committee oversees the Company's executive compensation strategy and programs, incentive compensation arrangements and the evaluation of risks related thereto. The Risk Committee assists the Board in fulfilling its oversight responsibilities with respect to the management of the Company's level of risk, risk assessment and risk management in areas not otherwise addressed by other committees of the Board, including the review of our information security programs and budgets, as well as review of our Cybersecurity Incident Response Plan and independent assessments of our information security programs. Other general business risks such as economic and regulatory risks are monitored by the full Board. The Board and Committees use outside resources to assist them in analyzing and monitoring certain risks, such as cybersecurity, in order to supplement the expertise and experience of the directors and management.

77.     In a section titled "Code of Ethics and Business Conduct," the 2024 Proxy Statement stated:

We have adopted a Code of Ethics that applies to all members of our Board and all of our employees, including our principal executive officer, principal financial officer, principal accounting officer and all other senior members of our finance and accounting departments. We require all employees to adhere to our Code of Ethics in

addressing legal and ethical issues encountered in conducting their work. Our Board periodically, and at least annually, reviews and revises our Code of Ethics, as appropriate. A copy of our Code of Ethics is available on our website, www.dmcglobal.com.

78.     The above statements contained or referenced in ¶¶76-77 were materially false and misleading because, contrary to the assertions contained therein, the Individual Defendants failed to carry out their obligations related to risk management and failed to abide by the Code of Conduct.

79.     Moreover the 2024 Proxy Statement was materially false and misleading as it failed to disclosure that: (i) the goodwill associated with Arcadia was overstated; (ii) the goodwill valuation method, and thus factors bearing on the goodwill valuation, was subject to change without notice to investors; (iii) DMC's internal controls were materially inadequate, resulting in inaccurate guidance and public disclosures; and (iv) as a result of the foregoing, Defendants misrepresented DMC's operations and financial results. As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

80.     As a result of the Board causing the issuance of the false and misleading 2024 Proxy Statement, DMC shareholders voted to, *inter alia*, re-elect Defendants Kuta, Dreesen, Kelly, O'Leary, Rose and Sananikone to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

**<u>Second Quarter 2024</u>**

81.     On August 1, 2024, after the markets closed, DMC issued a press release titled, "DMC Global Reports Second Quarter Financial Results," which was also filed on Form 8-K with the SEC and signed by Defendant Walter.

82.     The press release announced DMC's second quarter 2024 results including: $6.3 million in net income; $5.7 million in adjusted net income; $0.29 adjusted diluted EPS; $19.4

million in adjusted EBITDA (attributable to DMC Global); and $24.4 million total adjusted EBITDA, inclusive of NCI.

83.     The press release also announced third quarter 2024 guidance including $158 million to $168 million in sales ($64 million to $68 million attributed to Arcadia) with adjusted EBITDA of $15 million to $18 million (including $10 million to $12 million attributed to Arcadia before NCI).

84.     Also on August 1, 2024, after the markets closed, DMC also filed a quarterly report on Form 10-Q (the "2Q24 10-Q") with the SEC, which was signed by Defendants Walter and Seger.

85.     Attached to the 2Q24 10-Q were SOX certifications signed by Defendants Kuta and Walter attesting to the accuracy of the statements and financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting and the disclosure of all fraud.

86.     With respect to DMC's disclosure controls and procedures, the 2Q24 10-Q stated:

> *Our management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer have evaluated the Company's disclosure controls and procedures,* as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this report, *and they have concluded that these controls and procedures are effective.*

87.     The 2Q24 10-Q also reported goodwill of $141,725,000 as of June 30, 2024.

88.     The 2Q24 10-Q incorporated by reference the 2023 10-K, including the Company's goodwill statements and discussions of the "income approach," as set forth above in ¶ 59.

89.     The 2Q24 10-Q further stated that "[o]ur critical accounting estimates have not changed from those reported in Item 7 – Management's Discussion and Analysis of Financial Condition and Results of Operations in the Company's [2023 10-K]."

90.     Later the same day, on August 1, 2024, DMC conducted a conference call with analysts and investors to discuss the Company's second quarter 2024 results. On the call, Defendant Kuta had the following discussion with an analyst:

[Analyst]: *I guess I'll start with Arcadia. Obviously, the market is still pretty weak. It looks like you're expecting revenue down sequentially here from second quarter. I know you're not ready to give fourth quarter guidance or anything, but I'm curious about what the customers are kind of saying in terms of longer- term visibility? And how they're kind of thinking about stabilization or timing of stabilization within that market specifically?*

[Kuta]: I think that we've got a couple of -- I mean, just looking at the indicators out there and that we all look at, whether it's ABI in the West at 43 spot run or the Dodge Momentum Index, which points towards some favorable end markets, but once again driven by very kind of specific markets like data centers [indiscernible]. So I mean, you see all the same data that we do. *From a customer perspective, I think we're seeing – it's going to be soft markets for a couple of quarters here as we go out into the year.*

I think the good -- and in particular, when you look at our Q2, we were pretty resilient. We're seeing, obviously, our exposure to diverse end markets. Our bookings are relatively consistent and quoting activity has been good. *But there's folks citing interest rates that are pushing projects out.*

*So look, I think we've got a couple more quarters of softness. But I do think our guidance -- we guided in Q2 64% to 68%, Q3 is another 64% to 68% because that's sort of what the market is serving up. What we're doing though is the things that we can control, and we're talking about improving our operational effectiveness is really driving the profitability and the EBITDA at the bottom line and driving cash flow. And I feel confident that we're going to do that the remainder of this year for whatever the market serves up.*

91.    The above statements contained or referenced in ¶¶82-90 were materially false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the goodwill associated with Arcadia was overstated; (ii) the goodwill valuation method, and thus factors bearing on the goodwill valuation, was subject to change without notice to investors; (iii) as a result of delaying impairment of its goodwill associated with Arcadia, DMC's net income, assets, and equity on its balance sheet was overstated by material amounts; (iv) DMC's internal controls were materially inadequate, resulting in inaccurate guidance, financial reporting, and public

disclosures; and (v) as a result of the foregoing, Defendants misrepresented DMC's operations and financial results. As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Emerges***

92.    On October 21, 2024, after the market closed, DMC issued a press release titled, "DMC Global Provides Business and Strategic Review Update, Announces Governance Changes," which it also filed on Form 8-K with the SEC.

93.    The press release stated, in relevant part:

> DMC [] today provided an update on its business conditions and revised its third quarter financial guidance. The Company also commented on its strategic review process and announced governance changes. DMC said third quarter sales are expected to be approximately $152 million versus prior guidance of $158 million to $168 million. The results reflect weaker-than-expected sales at both Arcadia Products ("Arcadia"), DMC's architectural building products business, and DynaEnergetics, DMC's energy products business.
> Adjusted EBITDA* is now expected to be approximately $5 million versus prior guidance of $15 million to $18 million. Third quarter results will include inventory and bad debt charges at DynaEnergetics totaling approximately $5 million, as well as lower fixed overhead absorption on reduced sales at both Arcadia and DynaEnergetics.
>
> ***The Company said its third quarter financial results will include an approximate $142 million non-cash goodwill impairment charge associated with DMC's December 2021 acquisition of a controlling interest in Arcadia. The charge reflects Arcadia's recent financial performance and near-term outlook. These factors, combined with the significant decline in DMC's market capitalization, led the Company to conclude that the goodwill impairment charge was appropriate at this time.***
>
> DMC president and CEO Michael Kuta, who is also leading Arcadia on an interim basis, said, "Arcadia's third quarter performance was affected by weak commercial and high-end residential construction activity, lower fixed overhead absorption, and supply-chain

disruptions that impacted product availability. Results at DynaEnergetics were below expectations due to declining North American well-completion activity, a higher mix of lower margin customers in DynaEnergetics' U.S. markets, and the aforementioned inventory and bad debt charges. NobelClad, our composite metals business, is expected to deliver another strong quarter with sales and adjusted EBITDA results within or above our forecasted range."

94.    DMC also announced that "it is no longer actively marketing DynaEnergetics and NobelClad," ending the strategic review process the Company announced on January 29, 2024.

95.    On this news, DMC common stock declined from a closing price of $12.93 per share on October 21, 2024 to a closing price of $10.57 per share the next trading day, or more than 18%, on unusually high trading volume.

96.    Then, on November 4, 2024, after the market closed, DMC issued a press release titled, "DMC Global Reports Third Quarter Financial Results," which it also filed on Form 8-K with the SEC.

97.    The press release reported DMC's third quarter 2024 sales of $152.4 million, a $159.4 million net loss *(inclusive of a $141.7 million goodwill impairment charge at Arcadia)*, and adjusted EBITDA of $5.7 million.

98.    The press release also stated, in part:

At Arcadia, DMC's architectural building products business, persistent high interest rates have impacted sales to the high-end luxury home market and have resulted in continued soft commercial construction activity. *Under the direction of a new interim business president, Arcadia is executing a series of internal initiatives designed to strengthen sourcing and supply chain functions; improve sales, inventory and operations planning processes; and more effectively leverage Arcadia's enterprise resource planning system.* The business is also reviewing certain product lines that have not consistently met profitability targets.

Arcadia's improvement initiatives are being led by interim president Chris Scocos, who joined the business in September 2024 with a 25-year track record of implementing lean manufacturing, process

> improvement and operational excellence programs for industrial manufacturing businesses across a broad range of industries, including building materials and industrial manufactured products.

99.    Also on November 4, 2024, DMC also filed a quarterly report on Form 10-Q with the SEC (the "3Q24 10-Q"), which revealed that the Company had changed its valuation method of goodwill from the "income approach" to the "market approach." Specifically, DMC admitted that for the "quantitative goodwill impairment test," the Company "utilized the market approach to estimate the fair value of the Arcadia Products reporting unit, but also considered the income approach to validate the results."

100.    The 3Q24 10-Q went on to state that, "[b]ased on the results of our quantitative goodwill impairment test, we recorded a $141,725[,000] impairment charge to goodwill during the three and nine months ended September 30, 2024, which is included in 'Goodwill impairment' in our Condensed Consolidated Statements of Operations."

101.    Later the same day, on November 4, 2024, the Company conducted a conference call with analysts and investors to talk about its third quarter 2024 results. On the call, Defendant Kuta stated, in relevant part:

> Arcadia, our architectural building products business, reported third quarter sales of $57.8 million, down 17% sequentially and down 19% versus the third quarter last year. Arcadia's third quarter Adjusted EBITDA margin was 5.8%, down from 17.8% in the second quarter and 18.8% year over year. The decline principally reflects lower fixed cost absorption on reduced sales.
>
> Persistently high interest rates have negatively affected sales to Arcadia's high end luxury home market and also slowed commercial construction activity in several Arcadia's regional markets. Arcadia's third quarter is also impacted by supply chain disruptions that limited product availability.
>
> We recently named Chris Scocos as our new Interim President at Arcadia. He brings an extensive background in lean manufacturing, operational excellence and improving plant productivity. ***His immediate focus is on strengthening sourcing and supply chain***

27

*functions, improving sales inventory and operations planning processes and more effectively leveraging Arcadia's ERP system.* We also are reviewing certain product lines that have not consistently met our profitability targets.

102.    On the call, Defendants Kuta and O'Leary had the following exchange with analysts:

[Analyst]: Guys, I was hoping maybe to discuss a little bit more about the work they want to do at Arcadia and to improve operations. And then as maybe a subset to that question, are the systems in place to manage that? You talked about the ERP explicitly leveraging that, but just curious if all the systems are in place and then to go into a little bit more detail and maybe where some of the low-hanging food is or what have you, and what's the path forward on that front?

[O'Leary]: I'm going to turn it over to Mike [Kuta] on some of the specific initiatives that he and Chris [Scocos] have been initiating, accelerating, and I think pushing forward with the right skill sets for rarely the first time since the acquisition.

*A macro comment, which I think, again, we might have underestimated and certainly contributed to the goodwill write-off. We bought a family business.* We bought a family business that had excellent commercial people. They understood pricing, they understood their markets.

They had the right titles, the right org charts, the right people that at first blush look like they'd be able to handle the amount of change that comes with being a public company. And the digestion issues around ERP, putting in compliance around being a public company, making sure you've got not just people who have the title VP of supply chain, but actually know what that means, particularly in a post-COVID environment.

*We underestimated the challenges there.* And a couple of, we took a few calls after our last press release. And to me, these are things that are simple to diagnose, easy to spot, not really wildly difficult to fix if you have people with the right skill set, but take time.

*And putting the ERP system on with the aggressiveness of the implementation, dealing with upgrading people happens with every family company acquisition I've ever seen. And really dealing with just the robustness of the systems and the people, exactly what you think in a family company.*

*The answer was no, and that led to the write-off.* We've spotted,

diagnosed, have fixes in for all of them, takes a little bit of time. You'd feel a lot better if it was at a time when elections behind us, whichever party puts in place is going help me put a little bit more wind in the sails of the housing market more broadly and construction.

*And interest rates being a little bit lower would help the high-end residential market.* But that said, while it would be nice to have the wind in our sails, we recognize we don't. So we've got initiatives underway that are very specifically targeted to some of the things we probably could have been a little bit more respectful from the get-go on. Mike, you want to talk about some of the specific initiatives?

Kuta: Yes, [Analyst], so a couple of things that we're working on with the team relate to supply chain and sourcing so we can do a better job on both supply chain sourcing and planning as well as S&OP processes. So one of the gaps we have there is demand planning and knowing what we need when we need it. So that was, you know, some of my comments around the supply chain disruption. So we've got programs we're putting in place there, working on, you know, the other thing is there's some, there's the other item in the backend of our business is there's some improvements we can certainly make in our finishing operations. So, and a lot of that gets to, you get your supply chain deep bottlenecked and you got to get scheduling right and finishing up. So a lot of work we're doing on that to improve lead times on time and in full deliveries to customers, making sure we've got the shelf stock with product, making progress, but a ways to go. So there's good things happening, but it's going take some time as [O'Leary] mentioned to sort that out.

\*\*\*

Analyst: Okay. Maybe switching over to the restructuring actions you're taking. One, I thought *there was already an ERP implementation already kind of in place at Arcadia.* So when you talk about the sourcing initiatives, just what's kind of involved with that? And is there any way to kind of size the cash cost that's going to be associated with some of these restructuring actions you're taking and how long you expect that payback to be?

Kuta: So these are additions. We haven't talked specifically about any restructuring, *but certainly everything's on the table when you have results like we've had*, but there's nothing that we're specifically announcing. All the additions are top grading, upgrading people. You're 100% correct. We've talked about ERP in

> the past, but it certainly could have gone smoother and really holding people accountable and getting some additional resources are in. The cash costs, it's kind of part of doing business when you're top grading and adding people. Like in the case of Chris [Scocos], Chris [Scocos] is replacing a guy that we let go who had a comparable salary. So it's not a huge incremental cost that we'd put a payback on.

103.    On this news, the price of DMC common stock declined another 6%, from a closing price of $9.84 per share on November 4, 2024, to a closing price of $9.25 per share the next day, on unusually high trading volume.

## DAMAGES TO DMC

104.    As a direct and proximate result of the Individual Defendants' misconduct, DMC has expended and will continue to expend significant sums of money.

105.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

106.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

107.    DMC has also suffered, and will continue to suffer, a loss of reputation and goodwill as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward due to their misrepresentations.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

108.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as though fully set forth herein.

109.    Plaintiff brings this action derivatively in the right and for the benefit of DMC to redress injuries suffered, and to be suffered, as a direct and proximate result of the wrongdoing and breaches of fiduciary duty alleged herein.

110.    Plaintiff owns DMC common stock and has been a continuous shareholder at all relevant times. Plaintiff will adequately and fairly represent the interests of DMC in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

111.    DMC is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

112.    At the time this action was filed, DMC's Board consisted of Defendants O'Leary, Dreessen, Kelly, Rose, and Sananikone and non-party director John R. Doubman (the "Director Defendants"). Plaintiff needs only to allege that demand is futile as to a majority of the Director Defendants that were on the Board at the time of filing this complaint.

113.    A pre-suit demand on the Board to institute this action is futile because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. The Director Defendants will not bring a suit on behalf of DMC to recover damages sustained because of this misconduct because they would expose themselves to significant liability. As such, demand is futile as to the Director Defendants.

114.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct, as they were directors during the time of the false and misleading statements and as such had a fiduciary duty to ensure that DMC's SEC filings, press releases, and other public statements and presentations on behalf of DMC concerning its business, operations, prospects, internal controls, and financial statements were accurate.

115.    The Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that DMC was acting legally and its

internal controls were sufficiently robust and effective, and to ensure that the Board's duties were being discharged in good faith and with the required diligence. Instead, they reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused DMC's stock to trade at artificially inflated prices.

116.    The Director Defendants knowingly and consciously allowed the authorization of false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that DMC's internal controls were sufficiently robust and effective, and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence. These knowing and conscious failures breached the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

117.    Demand on Defendant O'Leary is futile for the additional reasons that follow. Defendant O'Leary has served as a Company director since 2023, for which he has and continues to receive substantial compensation. Defendant O'Leary also serves as DMC's President and CEO. As the Company admits in its 2025 Proxy Statement, Defendant O'Leary is a non-independent director. Thus, Defendant O'Leary is not independent from the members of the Compensation Committee who are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including himself because they are responsible for his financial future. Further, despite being the Company's highest officer and a trusted Company director, Defendant O'Leary failed to adequately oversee the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor controls over reporting and engagement in the scheme, and willfully ignored his duty to protect corporate assets. Additionally, Defendant O'Leary both solicited the false and misleading 2024 Proxy Statement (which resulted in, inter alia, his re-election to the Board) and signed the 2023 10-K (thus personally making such statements and omissions). For

these reasons, Defendant O'Leary breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant O'Leary is futile, and, therefore, excused.

118.    Demand on Defendant Dreessen is futile for the additional reasons that follow. Defendant Dreessen has served as a Company director since 2020, for which she has and continues to receive substantial compensation. Despite her role as a Company Director, Defendant Dreessen failed to adequately oversee the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor controls over reporting and engagement in the scheme, and willfully ignored her duty to protect corporate assets. Furthermore, Defendant Dreessen both solicited the false and misleading 2024 Proxy Statement (which resulted in, inter alia, her re-election to the Board) and signed the 2023 10-K (thus personally making such statements and omissions). For these reasons, Defendant Dreessen breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Dreessen is futile, and, therefore, excused.

119.    Demand on Defendant Kelly is futile for the additional reasons that follow. Defendant Kelly has served as a Company director since 2020, for which he has and continues to receive substantial compensation. Despite his role as a Company Director, Defendant Kelly failed to adequately oversee the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor controls over reporting and engagement in the scheme, and willfully ignored his duty to protect corporate assets. Furthermore, Defendant Kelly both solicited the false and misleading 2024 Proxy Statement (which resulted in, inter alia, his re-election to the Board) and signed the 2023 10-K (thus personally making such statements and omissions). For these reasons, Defendant Kelly breached his fiduciary duties, faces a substantial likelihood of

liability, and is not independent or disinterested. Thus, demand upon Defendant Kelly is futile, and, therefore, excused.

120.    Demand on Defendant Rose is futile for the additional reasons that follow. Defendant Rose has served as a Company director since 2016, for which he has and continues to receive substantial compensation. Despite his role as a Company Director, Defendant Rose failed to adequately oversee the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor controls over reporting and engagement in the scheme, and willfully ignored his duty to protect corporate assets. Furthermore, Defendant Rose both solicited the false and misleading 2024 Proxy Statement (which resulted in, inter alia, his re-election to the Board) and signed the 2023 10-K (thus personally making such statements and omissions). For these reasons, Defendant Rose breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Rose is futile, and, therefore, excused.

121.    Demand on Defendant Sananikone is futile for the additional reasons that follow. Defendant Sananikone has served as a Company director since 2023, for which she has and continues to receive substantial compensation. Despite her role as a Company Director, Defendant Sananikone failed to adequately oversee the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor controls over reporting and engagement in the scheme, and willfully ignored her duty to protect corporate assets. Furthermore, Defendant Sananikone both solicited the false and misleading 2024 Proxy Statement (which resulted in, inter alia, her re-election to the Board) and signed the 2023 10-K (thus personally making such statements and omissions). For these reasons, Defendant Sananikone breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Sananikone is futile, and, therefore, excused.

122.    Demand on Defendants Dreessen, Rose, and Sananikone is further futile for the additional reasons that follow. Defendants Dreessen, Rose, and Sananikone served as members of the Audit Committee (the "Audit Committee Defendants") during the Relevant Period. The Audit Committee is responsible for assisting the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting, the underlying internal controls and procedures over financial reporting, and the effectiveness of the Company's policies and procedures. These responsibilities include oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the external auditors' qualifications and independence; and (iv) the performance of the Company's internal and external audit functions. The Committee is also responsible for understanding the Company's internal control structure and areas that represent high risk for material misstatement of the financial statements. In violation of their duties, the Audit Committee Defendants failed to adequately review and discuss the Company's Forms 10-Q and 10-K; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Company Codes, resulting in materially false and misleading statements regarding the Company's business. The Audit Committee Defendants failed to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged herein. For these reasons, the Audit Committee Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not independent or disinterested. Thus, demand upon the Audit Committee Defendants is futile, and, therefore, excused.

123.    DMC has and will continue to be exposed to substantial losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused DMC to take action, including filing lawsuits against the Individual Defendants or those responsible for the wrongful conduct, to

recover the damages DMC has suffered and will continue to suffer. Thus, demand on the Director Defendants is futile and, therefore, excused.

124.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause DMC to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

125.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

126.    The Individual Defendants' conduct described herein is not the result of legitimate business judgment. Rather, their conduct was the product of bad faith and intentional, reckless, or disloyal misconduct. As such, none of the Director Defendants can claim exculpation from their violations of duty. A majority of the Director Defendants face a substantial likelihood of liability, are self-interested in the transactions challenged herein, and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of DMC. Thus, demand is futile and, therefore, excused.

127.    The Director Defendants may also be protected against personal liability for the misconduct and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e.,

monies belonging to the stockholders of DMC. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as the "insured-versus-insured exclusion." If the Director Defendants were to sue themselves or certain of the officers of DMC, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

128.    If there is no directors' and officers' liability, then the Director Defendants will not cause DMC to sue the Individual Defendants since they would face a large uninsured individual liability. Thus, demand is futile in that event as well.

129.    For the reasons set forth above, all of the Director Defendants, and if not all of them, a majority, cannot consider a demand with the requisite disinterestedness and independence. Consequently, a demand on the Board is excused as futile.

## COUNT I

### *Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act*

130.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

131.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or

consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

132.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

133.    Under the direction and watch of the Individual Defendants, the 2024 Proxy Statement failed to disclose that the Individual Defendants had violated the Code of Conduct and that the Board's risk oversight mechanisms and internal controls, which facilitated the illegal conduct described herein, were evidently inadequate given the aforementioned misconduct.

134.    The 2024 Proxy Statement also failed to disclose that: (i) the goodwill associated with Arcadia was overstated; (ii) the goodwill valuation method, and thus factors bearing on the goodwill valuation, was subject to change without notice to investors; (iii) as a result of delaying impairment of its goodwill associated with Arcadia, DMC's net income, assets, and equity on its balance sheet was overstated by material amounts; (iv) DMC's internal controls were materially inadequate, resulting in inaccurate guidance, financial reporting, and public disclosures; and (iv) as a result of the foregoing, Defendants misrepresented DMC's operations and financial results. As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

135.    In the exercise of reasonable care, the Individual Defendants knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder

determination in the 2024 Proxy Statement, including, but not limited to, the reelection of Defendants re-elect Defendants Kuta, Aldous, Dreesen, Kelly, O'Leary, Rose and Sananikone to the Board, thus allowing them to continue breaching their fiduciary duties to DMC, which resulted in damage to the Company.

136.    DMC was damaged because of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

137.    Plaintiff, on behalf of DMC, has no adequate remedy at law.

## CLAIM II

### Against the Individual Defendants for Breach of Fiduciary Duty

138.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

139.    By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

140.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

141.    The Individual Defendants knowingly issued/caused the Company to issue false financial statements and made false and misleading statements and omissions of material fact regarding DMC's business operations, practices, and international controls in connection therewith, as alleged herein. These actions could not have been a loyal and good faith exercise of prudent business judgment to protect and promote DMC's corporate interests. Rather, the Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.

142.    Specifically, the Individual Defendants breached their fiduciary duties owed to DMC by willfully or recklessly making and/or causing the Company to make false and misleading

statements and omissions of material fact, failing to disclose that: (i) the goodwill associated with Arcadia was overstated; (ii) the goodwill valuation method, and thus factors bearing on the goodwill valuation, was subject to change without notice to investors; (iii) as a result of delaying impairment of its goodwill associated with Arcadia, DMC's net income, assets, and equity on its balance sheet was overstated by material amounts; (iv) DMC's internal controls were materially inadequate, resulting in inaccurate guidance, financial reporting, and public disclosures; and (iv) as a result of the foregoing, Defendants misrepresented DMC's operations and financial results. As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

143. The Individual Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

144. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

145. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

146.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, DMC has sustained significant damages, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, and reputational harm.

147.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

148.    Plaintiff, on behalf of DMC, has no adequate remedy at law.

## CLAIM III

### *Against the Individual Defendants for Gross Mismanagement*

149.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

150.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

151.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, DMC has sustained significant damages in excess of hundreds of millions of dollars and will continue to sustain significant damages.

152.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

153.    Plaintiff, on behalf of DMC, has no remedy at law.

## CLAIM IV

### *Against the Individual Defendants for Waste of Corporate Assets*

154.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

156.    As a result of the misconduct described above, and by failing to properly consider the interests of DMC and its public shareholders, the Individual Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to investigate and defend Defendants' unlawful actions; and (iv) causing the loss of financing from investors and business from future customers who no longer trust DMC and its products.

157.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

158.    Plaintiff, on behalf of DMC, has no adequate remedy at law.

## CLAIM V

### *Against the Individual Defendants for Unjust Enrichment*

159.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

160.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, DMC.

161.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

162.    Plaintiff, as a shareholder and representative of the Company seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

163.    Plaintiff, on behalf of DMC, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of DMC and that Plaintiff is a proper and adequate representative of the Company;

B.    Against all Individual Defendants and in favor of DMC for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other acts and transactions complained of herein;

164.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to DMC;

C.    Grant appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties, including, but not limited to, directing DMC to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect DMC and its stockholders from a repeat of the damaging events described herein;

D.      Awarding to DMC restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees, costs, and expenses; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: July 16, 2025

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Phillip Kim
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*

Docusign Envelope ID: 8A60FB09-1B82-4DE9-A096-3CBCE4E8B1DF

## **<u>VERIFICATION</u>**

I, Lee Runey am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.    7/16/2025

Signed by:

*Lee Runey*

—0C731E54425D450...

Lee Runey